Sheri Diane FISHBAUGHER, Plaintiff,

v.

Michael J. ASTRUE, Defendant.

Civ. No. 11–1252 (MJD/JJK).

United States District Court,
D. Minnesota.

June 25, 2012.

Fay E. Fishman, Esq., Peterson & Fishman, for Plaintiff.

Gregory G. Brooker, Esq., and Lonnie F. Bryan, Esq., Assistant United States Attorneys, for Defendant.

## ORDER

MICHAEL J. DAVIS, Chief Judge.

The above matter comes before the Court upon the Report and Recommenda-tion of United States Magistrate Judge Jeffrey J. Keyes dated June 11, 2012. No objections have been filed to that Report and Recommendation in the time period permitted. Based upon the Report and Recommendation of the Magistrate Judge, upon all of the files, records, and proceed-ings herein, the Court now makes and enters the following Order.

**IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 8), is **GRANTED,** and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for reversal and award of benefits; and

2. Defendant's Motion to Remand (Doc. No. 14), is **DENIED.**

**LET JUDGMENT BE ENTERED**

## REPORT AND RECOMMENDATION

JEFFREY J. KEYES, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Sheri Fishbaugher seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits. Plaintiff filed a Motion for Summary Judgment and the Commis-sioner filed a Motion to Remand. (Doc. Nos. 8, 14.). This matter has been re-ferred to the undersigned for a Report and Recommendation. pursuant to 28 U.S.C. § 636, Fed. R. of Civ. P. 72, and D. Minn. Loc. R. 72.1. For the reasons stated be-low, this Court recommends granting Plaintiff's Motion for Summary Judgment and denying Defendant's Motion to Re-mand.

## BACKGROUND

### I. Procedural History

▮ Plaintiff protectively filed an appli-cation for disability insurance benefits

("DIB") on March 20, 2007, alleging a disability onset date of December 30, 2003. (Tr. 10, 129–33.)[1] Her date last insured is December 31, 2006.[2] (*See, e.g.,* Tr. 10, 134.) The application was denied initially and on reconsideration. (Tr. 55–59, 63–65.) Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on February 10, 2010. (Tr. 23–45, 66–67.) On April 8, 2010, the ALJ issued an unfavorable decision. (Tr. 7–22.) Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on April 12, 2011. (Tr. 1–4.) The denial of review made the ALJ's decision the final decision of the Commissioner. *See* 42 U.S.C. § 405(g); *Clay v. Barnhart,* 417 F.3d 922, 928 (8th Cir.2005); *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir.1992).

On May 13, 2011, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.) Thereafter, Plaintiff filed a motion for summary judgment. *See* D. Minn. Loc. R. 7.2. In response, the Commissioner filed a motion to remand for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). Plaintiff opposes remand for further proceedings and seeks reversal for an award of benefits.

## II. Statement of Facts

The following detailed medical history concerning Plaintiff's fibromyalgia and other relevant medical problems is drawn from the medical records that are part of the record in this case.

Dr. Dennis Colby evaluated Plaintiff for kidney infection at Cresco Medical Clinic on January 19, 2004. (Tr. 498.) An x-ray of her lumbar spine showed early degenerative changes. (Tr. 498, 547.) The next week, Plaintiff was evaluated for bladder infection, headache, and back pain. (Tr. 497.) Plaintiff's bladder infection was treated, and Dr. Colby recommended Aleve for headaches. (*Id.*)

On February 4, 2004, Plaintiff returned to Dr. Colby for treatment of mild back pain. (Tr. 496.) She also had some abdominal pain and blood in the urine. (*Id.*) She was referred to Dr. Ajay Nehra at the Mayo Clinic Urology Department for evaluation of her recent episodes of hematuria and bilateral flank pain. (Tr. 449.) Plaintiff had a long history of bilateral vesicoureteral reflux,[3] and later, significant flank pain with off and on episodes of pyelonephritis.[4] (*Id.*) Dr. Nehra ordered a CT urogram, cystoscopy, and lab tests. (*Id.*)

Dr. Nehra referred Plaintiff to Dr. Shabana Pasha for a multi-system evaluation, which was performed on February 12, 2004. (Tr. 446–48.) At that time, Plaintiff reported that she had had low back pain for six months, and intense pain that increased when Plaintiff was fatigued. (Tr. 446.) Tylenol only mildly reduced her pain. (*Id.*) Also, based on an outside x-ray report, Plaintiff stated she was concerned about spinal infection. (*Id.*) She reported an onset of constipation for one month, which did not improve with Miralax, and she was taking Percocet recently, which

---

1. Throughout this Report and Recommendation, reference to the Administrative Record (Doc. No. 7), for this case is made by using the abbreviation "Tr."

2. A claimant has to establish "the existence of a disability on or before the date that the insurance coverage expires." *Basinger v. Heckler,* 725 F.2d 1166, 1168 (8th Cir.1984).

3. Vesicoureteral reflux is the passage of urine from the bladder back into a ureter. *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 1640 (31st ed.2007).

4. Pyelonephritis is inflammation of the kidney and renal pelvis because of bacterial infection. *Dorland's* at 1582.

might have been contributing to her constipation. (*Id.*) Plaintiff also reported constant lower abdominal discomfort. (*Id.*) Plaintiff's physical examination was normal, with the exceptions of mild tenderness of the abdomen and tenderness over the lumbosacral paraspinal region. (Tr. 447.) She was referred to Physical Medicine & Rehabilitation for her back pain. (*Id.*)

Plaintiff had an MRI of her lumbar spine that same day. (Tr. 428.) The MRI showed degenerative disk disease with loss of space height and bulging of the annulus fibrosus at the L2 interspace, and mild associated degenerative changes at the adjacent L2 and L3 endplates. (*Id.*) There were also changes of spondylosis[5] at the L3 and L4 interspaces, with bulging of the annulus fibrosus and facet joint hypertrophy. (*Id.*) The MRI also showed small presumed cysts on the kidneys. (*Id.*) Testing confirmed the simple cysts on the kidneys, a tiny indeterminate nodule on the right lung base, and two tiny cysts on the liver. (*Id.*)

Also on February 12, 2004, Plaintiff saw Dr. Andrea Boon in the Physical Medicine and Rehabilitation Department at Mayo Clinic. (Tr. 455–57.) Dr. Boon reviewed Plaintiff's daily activities and her symptoms. (Tr. 455.) Plaintiff lived on a farm with her husband, where they managed a large hog and cattle herd. (*Id.*) Their four-year-old and fourteen-year-old children lived with them. (*Id.*) Plaintiff also had an 18–year–old son who lived in Los Angeles. (*Id.*)

Plaintiff reported that she was in a car accident at approximately age eighteen, with back pain lasting a year. (*Id.*) Her back pain significantly increased after her second pregnancy. (*Id.*) Her back pain was manageable, until the last six months. (*Id.*) The pain started in the low back and spread to the lower thoracic spine. (*Id.*) Plaintiff also reported a fifty pound weight loss associated with her medication for attention deficit disorder. (*Id.*)

Plaintiff's back pain was constant and worse when riding in a car or sitting more than a few minutes, but she had a little relief from lying down. (*Id.*) The pain got worse as the day continued, but she had some relief from changing positions. (*Id.*) Plaintiff agreed that she had a low pain tolerance, but she used to cope better. (*Id.*) Ibuprofen did not help at all, and Plaintiff was using an old prescription she had for Percocet from a past surgery. (*Id.*) Plaintiff also reported that she developed constipation and difficulty sleeping in the last couple months. (Tr. 456.) She woke up wet from sweating. (*Id.*) She also had longstanding urinary tract problems. (*Id.*)

On examination, Plaintiff was overweight and clearly distraught. (*Id.*) She walked tentatively but normally. (*Id.*) The strength, bulk, and tone of all major muscle groups were normal. (*Id.*) Reflexes and sensation were normal. (*Id.*) Straight leg raise test was normal. (*Id.*) Tenderness to palpation was consistent with fibromyalgia.[6] (*Id.*) And lumbar range of mo-

---

5. Spondylosis is used to generally describe degenerative spinal changes due to osteoarthritis. *Dorland's* at 1780.

6. Fibromyalgia is a disorder of unknown cause characterized by chronic widespread aching and stiffness involving particularly the neck, shoulders, back and hips, which is aggravated by use of the affected muscles. The American College of Rheumatology has estab- lished diagnostic criteria that includes pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, lumbar spine or anterior chest). Additionally, point tenderness must be found in at least 11 of 18 specified sites.... Usually associated fatigue, a sense of weakness or inability to perform cer-

tion was decreased secondary to pain. (*Id.*) Dr. Boon noted that Plaintiff was extremely agitated about her current level of symptoms and recommended pain control to prevent Plaintiff from developing full-blown chronic pain syndrome. (Tr. 457.) She also recommended an MRI, epidural steroid injection, Vioxx, Trazodone for sleep, and physical therapy. (*Id.*) In addition, she recommended a formal psychiatric evaluation. (*Id.*)

Plaintiff followed up with Dr. Pasha on February 17, 2004, to review test results. (Tr. 444–45.) At that time, Plaintiff's degenerative lumbar spondylosis was treated with corticosteroid injection. (Tr. 444.) Dr. Pasha noted that Plaintiff initially presented with weight loss, but now had an eight pound weight gain. (*Id.*) Her thyroid function was normal and she had no other symptoms to suggest an endocrinological disorder. (*Id.*) And her remaining lab results were normal. (*Id.*)

Plaintiff also saw Brian Bjerke for physical therapy that day and was instructed in the dynamic lumbar program—specifically for use of "lumbar neutral" in activities of daily living. (Tr. 454.) Plaintiff performed a number of stretches and was instructed to continue at home. (*Id.*)

On February 23, 2004, Dr. Nehra diagnosed Plaintiff with bilateral flank pain, with no evidence of hematuria and normal CT urogram findings. (Tr. 443.) He recommended follow up with Dr. Boon and Dr. Shabana. (*Id.*) In physical therapy with Brian Bjerke that day, Plaintiff's discomfort had not decreased. (Tr. 453.) Plaintiff reviewed her lumbar exercises,

but she was in too much pain to progress further. (*Id.*) Three days later, Plaintiff called Dr. Pasha to report that her back pain was worse, she was unable to sleep, and she had difficulty performing activities. (Tr. 442.) Plaintiff questioned whether she might have fibromyalgia. (*Id.*) Because Plaintiff's clinical presentation and MRI findings did not suggest another cause of her back pain, Dr. Pasha recommended evaluation in the Pain Rehabilitation Department for chronic pain syndrome/fibromyalgia. (*Id.*)

On March 2, 2004, Plaintiff went over her Mayo Clinic evaluations with Dr. Colby. (Tr. 494.) Dr. Colby noted that Plaintiff had educated herself about fibromyalgia, and she continued to have back pain at a level of eight or nine out of ten. (*Id.*) Dr. Colby prescribed Klonopin and Ultram. (*Id.*) Dr. Colby also completed a form indicating that Plaintiff could not bend, lift, or clean, and she needed daycare for her child. (Tr. 657.)

The next week, Plaintiff told Dr. Colby she was doing "fair." (Tr. 493.) Her pain was somewhat better with treatment, but then started to recur. (*Id.*) Plaintiff reported that she wanted to get off Percocet. (*Id.*) Dr. Colby prescribed Ultram, and Plaintiff's other medications at that time were Vioxx, Klonopin, Lexapro, Adderall, and Trazodone. (*Id.*) Ten days later, Plaintiff reported doing fairly well with treatment. (Tr. 492.) She stated that she recently went on a trip without many problems. (*Id.*) At that time, Dr. Colby provided OMT [7] and hot packs. (*Id.*)

tain movements, paresthesia, difficulty sleeping and headaches are found.
*Stedman's Medical Dictionary* 725 (28th ed.2006).

**7.** OMT stands for Osteopathic Manipulative Treatment, manipulation performed by a doc-

tor of osteopathy to improve joint range of motion and balance tissue and muscle mechanics to relieve pain. http://www.spinehealth.com/treatment/spine-specialists/osteopathic-manipulative-treatment-omt.

On March 24, 2004, Dr. Margaret Moutvic and Nurse Elizabeth Miller evaluated Plaintiff for fibromyalgia at the Mayo Clinic Fibromyalgia Treatment Program. (Tr. 435–37, 439–41.) Plaintiff reported that her medical history included many years of urologic dysfunction, with repeated infections coming back in the last couple years and blood in her urine earlier in the year in January. (Tr. 435, 439.) She had low back pain that was diagnosed as osteoarthritis and myofascial element. (Tr. 435.) During this visit, Plaintiff questioned whether she had fibromyalgia. (*Id.*) Her symptoms included fatigue, poor sleep, headaches, TMJ pain, lightheadedness, imbalance, palpitations, night sweats, irritable bowel, irritable bladder, numbness, tingling, stiffness, muscle spasms, cold intolerance, heat intolerance, multiple sensitivities, short-term memory impairment, decreased concentration, anxiety, crying spells, and irritability. (Tr. 439.) Her symptoms were aggravated by exertion, repetitive motion, prolonged sitting or standing, and stress. (*Id.*) Plaintiff was also receiving the services of a home health aide through her county for twenty-eight hours a week. (*Id.*)

Plaintiff reported that she was taking Adderall for adult attention deficit disorder. (Tr. 435.) She reported that she always excelled in school and was now worried about having poor memory. (*Id.*) On mental status examination, Plaintiff did not seem anxious, but her speech was somewhat pressured. (Tr. 436.) Her memory was normal. (Tr. 440.) On neurological examination, balance was difficult for her. (Tr. 436.) It was hard to assess her strength due to give-way weakness. (*Id.*) Reflexes and sensation were normal. (*Id.*) Joint range of motion was full, but Plaintiff was tender almost everywhere. (*Id.*) She had eighteen of eighteen standard tender points. (Tr. 440.) The straight leg raise test was very painful, but not in a radicular pattern. (Tr. 436.) And lab tests showed slight anemia, but were otherwise normal. (Tr. 437.)

Dr. Moutvic diagnosed Plaintiff with fibromyalgia and recommended a one-and-a-half day Fibromyalgia Treatment Program, and if that was insufficient to improve Plaintiff's functioning, the Pain Rehabilitation Program. (Tr. 437, 441.) The Fibromyalgia Treatment Program focused on addressing the nervous system's hyper-responsiveness to normal stimuli, and improving sleep, fitness, and exercise. (Tr. 437, 441.) Dr. Moutvic did not recommend any changes to Plaintiff's medications because she was already taking Trazodone and Lexapro. (Tr. 437.)

On March 25, 2004, Plaintiff consulted with Dr. Christopher Sletten at the Mayo Clinic Pain Rehabilitation Center. (Tr. 432–33.) Plaintiff had just completed the Fibromyalgia Treatment Program, but she felt she needed more intensive treatment because her ability to assist her husband on their farm and to take care of the household was greatly diminished by pain. (Tr. 432.) Dr. Sletten recommended a three-day treatment program with physical and occupational therapy for physical reconditioning and improving activity tolerance. (*Id.*)

On April 2, 2004, Plaintiff saw Dr. Colby again, and rated her pain at an eight out of ten. (Tr. 491.) Plaintiff reported that she did not think she could do the Mayo rehabilitation program because there was farm work coming up that would need to be done. (*Id.*) Dr. Colby treated Plaintiff with OMT and hot packs. (*Id.*) When Plaintiff followed up with Dr. Colby on May 12, 2004, she was under increased stress because her step-daughter moved in with them when her mother died. (Tr. 490.) Dr. Colby noted that he felt this stress increased Plaintiff's fibromyalgia.

(*Id.*) He took Plaintiff off Lorazepam, but increased her Trazodone. (*Id.*) A couple of weeks later, Plaintiff reported that, as a result of the fibromyalgia she was not doing well, although Trazodone had improved her sleep. (Tr. 489.) On examination, Plaintiff had point tenderness and marked spasms in the cervical, thoracic, and lumbar spine. (*Id.*) Dr. Colby provided OMT and hot packs again. (*Id.*) And Plaintiff was treated with Diflucan for oral candidiasis.[8] (*Id.*)

On May 24, 2004, Plaintiff complained to Dr. Colby of pain everywhere, and rated it at a level nine out of ten. (Tr. 488.) She felt this was caused by overdoing it the previous day helping with the farm chores. (*Id.*) Dr. Colby noted that Plaintiff seemed to do better when she did not overdo it. (*Id.*) The next week, Dr. Colby treated Plaintiff for a bladder infection. (Tr. 487.) And the next month, Plaintiff reported feeling significantly worse after taking a long-distance trip to California. (Tr. 486.) She tolerated the trip but her stress increased her pain. (*Id.*) Dr. Colby treated her with OMT and hot packs. (*Id.*) A week later, Plaintiff reported some improvement with physical therapy. (Tr. 485.) However, the following week, Plaintiff's back pain was worse. (Tr. 484.) Plaintiff followed up again on August 18, 2004, reporting low blood sugars. (Tr. 482.) Dr. Colby diagnosed fibromyalgia, fatigue, and hyperglycemia. (*Id.*) He treated Plaintiff with OMT and hot packs and ordered lab tests. (*Id.*) Two days later, he treated Plaintiff for headache and sinus infection. (Tr. 481.)

When Plaintiff saw Dr. Colby on September 2, 2004, she was having fibromyalgia pain and discomfort throughout her body. (Tr. 480.) Physical therapy was helping, but she had trouble sleeping at night. (*Id.*) Dr. Colby treated Plaintiff with OMT treatment and hot packs. (*Id.*) By the end of the month, Plaintiff had gained eight pounds. (Tr. 479.) Dr. Colby noted that Plaintiff was hypoglycemic and set up a dietary consult. (*Id.*) Plaintiff also complained of hot and cold flashes, and Dr. Colby ordered testing for perimenopausal syndrome. (*Id.*) Two weeks later, Plaintiff's low back was quite sore, and Dr. Colby treated her again with hot packs, and also prescribed a Tens Unit. (Tr. 478.)

On November 3, 2004, Plaintiff reported doing "fair," but Dr. Colby thought she had been trying to do too much. (Tr. 477.) The next week, Plaintiff reported that she was in quite a bit of back pain, and she stated that she "overdid it" that last weekend and had to lie on the couch the next day. (Tr. 476.) The next month, Plaintiff reported back pain and crying episodes, which she attributed to the season. (Tr. 474.) Plaintiff also had marked spasms in her back. (*Id.*) Dr. Colby added Celebrex to Plaintiff's medications. (*Id.*) Several weeks later, Plaintiff's back pain and sadness continued, and Dr. Colby treated her with OMT and hot packs. (Tr. 475.)

On January 3, 2005, Plaintiff complained to Dr. Colby of back pain and headaches. (Tr. 473.) Dr. Colby noted that Plaintiff had some improvement in her fibromyalgia from Skelaxin at that time, which he had prescribed in addition to Adderall, Percocet, Keflex, and Tazorac. (*Id.*) However, several days later Plaintiff saw Dr. Colby again after falling on some ice. (Tr. 472.) She reported hurting all over, with pain radiating down her legs. (*Id.*) Upon examination, she had marked spasms in the cervical, thoracic, and lumbar muscles, but no fractures were seen on x-rays. (Tr.

---

8. Oral candidiasis is also called thrush, which is characterized by white plaques that may be stripped off, leaving a raw bleeding surface in the mouth. It usually affects sick or weak infants, individuals in poor health, and immunocompromised patients. *Dorland's* at 285.

472, 544.) Dr. Colby diagnosed Plaintiff with thoracic lumbar sprain and prescribed a Medrol dose pack. (Tr. 472.) Six days later, Plaintiff was better but still rated her pain at an eight out of ten. (Tr. 471.) And when she saw Dr. Colby in February 2005, she reported pain in her low back, mid back, and neck. (Tr. 470.) She also had increased bowel problems. (*Id.*) Dr. Colby continued to treat Plaintiff with OMT and hot packs. (Tr. 469, 470.)

On April 4, 2005, Dr. Colby wrote a letter to Disability Determination Services[9] about Plaintiff's inability to work. (Tr. 467.) Dr. Colby noted that Plaintiff was diagnosed with fibromyalgia at Mayo Clinic, and that she was unable to work due to severe back pain. (*Id.*) He noted that Plaintiff could not do her normal activities of daily living, or stand, sit, walk, carry, or lift for any length of time. (*Id.*) He stated that if Plaintiff tried to be more active, she would need to rest in bed for the next day or two. (*Id.*) He indicated that her medication helped keep her focused, but without medication, her attention was very poor. (*Id.*)

Plaintiff also underwent a consultative psychological evaluation with Dr. Debra Moran on April 25, 2005, at the request of the Social Security Administration. (Tr. 551.) Dr. Moran noted that Plaintiff first married at age eighteen, and her first husband was abusive. (*Id.*) She had two children and she was divorced in 1993. (Tr. 551–52.) She remarried in 2003, and raised her two children, her step-child, and an adopted five-year-old son with her second husband. (Tr. 552.)

Plaintiff explained to Dr. Moran that she had a high school education, and took some civil engineering classes, but quit to help her husband on their farm. (*Id.*) She reported being in too much pain to help now, and her husband had to hire help off and on. (*Id.*) From 1994 to 1998, Plaintiff and her husband had owned a movie theater. (*Id.*) And before that, Plaintiff operated an in-home daycare center for five years. (*Id.*)

Plaintiff reported that she was diagnosed with fibromyalgia in March 2004, but that she had some symptoms of hypersensitivity to her skin all her life. (*Id.*) She was also depressed and experienced pain in her body for much of her life. (*Id.*) Plaintiff rated her pain that day as "much higher than a 10" but her pain level averaged seven or eight on a scale of one to ten. (*Id.*) She could not walk long distances; her neck pain and headaches were constant; she had episodes of "fibro fog" where she could not think straight; her sleep was disturbed; and she had chronic kidney infections. (*Id.*) Plaintiff also had a long history of depression. (Tr. 553.) When depressed, her symptoms were fatigue, hopelessness, worthlessness, and crying spells. (*Id.*) She also had difficulty with organization, attention, and concentration. (*Id.*)

Plaintiff reported that she would typically wake up at 8:15 a.m. to get her son ready for school. (*Id.*) Then, she would watch television or do some scrapbooking, and would try to clean. (*Id.*) Plaintiff reported that she did not shower or change her clothes every day. (*Id.*) She or her husband would make lunch, and washing dishes was sometimes too painful for her. (*Id.*) After gardening for two hours one day, she could not move the next day. (*Id.*) She could not do laundry or yardwork. (*Id.*) On a good day, she would buy

9. In Minnesota, the Disability Determination Services of the Minnesota Department of Jobs and Training has been designated to handle the first two stages of the Social Security disability administrative adjudication process, under the authority and control of the Commissioner of Social Security. *Schoolcraft v. Sullivan,* 971 F.2d 81, 83 (8th Cir.1992).

groceries. (*Id.*) She tried to pick up after her son, she helped with supper twice a week, she enjoyed reading, and she was able to do bookwork. (*Id.*) She went to bed between 10:00 p.m. and 3:00 a.m. (*Id.*)

On examination, Dr. Moran found that Plaintiff's mental status was normal, her memory appeared adequate, and her mood was euthymic. (Tr. 553–54.) Dr. Moran diagnosed Plaintiff with major depressive disorder, ADD, and fibromyalgia. (Tr. 554.) She opined that Plaintiff's pace may be slow, but her persistence was probably adequate. (*Id.*) She also thought Plaintiff's concentration would likely be limited, but that Plaintiff could interact appropriately with others in the workplace. (*Id.*) In addition, Dr. Moran opined that Plaintiff would be capable of understanding simple instructions, but may have difficulty with complex instructions when she was in more physical pain. (*Id.*)

On May 12, 2005, Dr. Alan Suddard reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment form regarding Plaintiff at the request of the Social Security Administration. (Tr. 557–64.) Dr. Suddard opined that Plaintiff had the ability to frequently lift ten pounds, but no more than that, and Plaintiff could stand and/or walk two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (Tr. 558.) He found no other limitations and wrote the following: "Lack of objective findings to support multiple pain complaints. Aerobic exercise has been prescribed for this condition. This is not to suggest that as an RFC here, but there doesn't seem to be any barrier to seated work." (*Id.*)

On the same day, a state agency psychological consultant reviewed Plaintiff's record at the request of the Social Security Administration, and completed a Psychiatric Review Technique form regarding Plaintiff. (Tr. 566–79.) The consultant opined that Plaintiff's mental impairments of ADHD and major depressive disorder resulted in mild restrictions in Plaintiff's activities of daily living; mild difficulties in Plaintiff's social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 566–76.)

On May 28, 2005, Plaintiff went to the Regional Health Services of Howard County emergency room for treatment of a severe headache. (Tr. 603–10.) Plaintiff vomited and complained of light intolerance. (Tr. 605.) A CT scan of Plaintiff's head was negative and her physical examination was normal. (Tr. 605, 607.) Plaintiff was released after some improvement with Phenergan, Demerol, and Toradol. (Tr. 606.)

On February 12, 2007, Plaintiff was evaluated for left knee pain by Dr. Randall Gall. (Tr. 618–19.) Plaintiff reported that her left knee pain had lasted six months and hurt when using stairs and getting up from the floor. (Tr. 618.) Plaintiff had some pain on examination, and moderate effusion of the left knee. (*Id.*) Her MRI showed a popliteal cyst, laterally subluxed patella, and chondromalacia of the medial joint compartment, but no other abnormalities. (*Id.*) Dr. Gall recommended a quad strengthening program for treatment. (*Id.*)

On July 23, 2007, based on evidence of Plaintiff's migraine headaches and knee pain, Dr. Howard Atkin provided the Social Security Administration with a Physical Residual Functional Capacity Assessment regarding Plaintiff. (Tr. 630–37.) He limited Plaintiff to medium exertional work, with occasional climbing ramps, stairs, ladders, ropes, and scaffolds; occasional kneeling; and occasional crawling. (Tr. 630–32.) Dr. Atkin's opinion was affirmed by Dr. Sandra Eames on December 11, 2007. (Tr. 649–51.)

On August 27, 2007, Plaintiff underwent a psychological consultative evaluation with Dr. Daniel Carlson, at the request of the Social Security Administration. (Tr. 640–42.) Plaintiff reported that her physical conditions of fibromyalgia, degenerative disk disease, thyroid disease, and pre-diabetes, contributed to her depression. (Tr. 640.) She also reported that she was diagnosed with ADD six or seven years earlier, and had difficulty with attention, misplacing things, not finishing tasks, and being forgetful. (*Id.*) She could not identify any problems that were caused by her attention deficit symptoms in work situations, but she stated that Adderall helped her ADD greatly. (*Id.*)

Plaintiff explained that she lived on a farm with her husband and children. (Tr. 641.) She had a personal care attendant who helped her up to thirty-five hours a week. (*Id.*) Plaintiff watched television, and with help, cleaned and gardened. (*Id.*) When she felt able, she knitted, made scrap books, did puzzles, quilted, and sewed. (*Id.*) She also enjoyed playing legos with, and reading to, her son. (*Id.*) She did not shop because it caused fatigue. (*Id.*) She iterated that her concentration and persistence with tasks greatly improved with Adderall. (*Id.*) She stated that she generally got along with others, but that there were some problems with family members accepting her diagnosis and physical limitations. (*Id.*)

On examination, Plaintiff's mental status was normal and her mood was good. (*Id.*) Dr. Carlson noted that Plaintiff did not seem to have been limited by ADD in her education or work history. (Tr. 642.) He assessed Plaintiff with a GAF score of 75.[10] (*Id.*) Based on her mental, not physical, impairments, Dr. Carlson opined that Plaintiff could perform work tasks with adequate persistence and pace; could respond appropriately to brief contact with coworkers and supervisors; and had a good ability to respond to the stress of an entry-level job. (*Id.*) On September 4, 2007, state agency consultant Dr. Thomas Kuhlman completed a Psychiatric Review Technique Form regarding Plaintiff at the request of the Social Security Administration. (Tr. 585–98.) He also opined that Plaintiff did not have a severe mental impairment. (Tr. 585.) Dr. Kuhlman's opinion was affirmed by Dr. Russell Ludeke on December 11, 2007. (Tr. 652–54.)

On February 14, 2008, Dr. Colby signed a form apparently indicating his opinion that Plaintiff needed personal care assistant ("PCA") services. (Tr. 655, 239–416 (PCA records)). Then, on October 17, 2008, Dr. Colby signed a Fibromyalgia Residual Functional Capacity Questionnaire, apparently completed by someone else, stating that he agreed with what was in the form. (Tr. 658–63.) The top of the form instructed: "Please complete this form for her condition prior to December 2006." (Tr. 658.) The responses to ques-

---

10. The Global Assessment of Functioning Scale ("GAF") is used to report "the clinician's judgment of the individual's overall level of functioning." *Hudson ex rel. Jones v. Barnhart*, 345 F.3d 661, 662 n. 2 (8th Cir. 2003) (quoting *Diagnostic and Statistical Manual of Mental Disorders* 32 ("DSM–IV–tr") (4th ed. text revision 2000)). GAF scores of 61–70 indicate the individual has some "mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational or school functioning (e.g., occa-sional truancy or theft from within the household), but generally [is] functioning pretty well [and] has some meaningful interpersonal relationships." *DSM–IV–tr* at 34. A GAF score of 71 to 80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument); [the individual has] no more than slight impairment in social, occupational, or school functioning (e.g., temporary falling behind in schoolwork)." *Id.* at 32.

tions on the form indicated that stress contributed to the severity of Plaintiff's symptoms, but she was not a malingerer. (Tr. 659.) Also, Plaintiff had pain all over, every day, and it was worse with overuse. (Tr. 659–60.) Changing weather, stress, fatigue, cold, overuse, and hormonal changes all precipitated pain. (Tr. 660.) The form indicated that Plaintiff's pain was severe enough to interfere with attention and concentration constantly, but she could tolerate low stress. (*Id.*)

The form also indicated that Plaintiff could walk 200 feet without rest or severe pain. (Tr. 661.) She could sit or stand for thirty minutes at a time, but only for a total of less than two hours a day in each position. (*Id.*) She would need to walk for ten or fifteen minutes every thirty minutes. (*Id.*) She would need to be able to shift positions at will, and would need unscheduled breaks during an eight-hour working day. (Tr. 662.) She could lift and carry five pounds in a competitive work setting. (*Id.*) But repetitive motions increased her pain, and she was limited in her grasping, fine finger manipulations, and reaching with her arms, and she could not stoop or crouch. (Tr. 662–63.) The form indicated that Plaintiff had good days and bad days, but the majority were bad days. (*Id.*) And she would likely miss work due to her impairments more than four times a month. (*Id.*)

## III. Testimony at the Administrative Hearing

### Plaintiff's Testimony

Plaintiff testified to the following at the hearing before the ALJ on February 10, 2010. (Tr. 25–41.) Plaintiff was a high school graduate and studied civil engineering for one year in college. (Tr. 27.) At the time of the hearing, she lived with her husband, who was a farmer, and their two children aged eighteen and ten. (Tr. 26.)

Plaintiff described how she spent her days. She woke up but did not get out of bed when her son went to school at 7:00 a.m. (*Id.*) She watched television and stayed in bed until 11:00 a.m. (*Id.*) Then, she went downstairs to knit or scrapbook. (*Id.*) She went back to bed to watch television or read at 4:00 or 5:00 p.m. (Tr. 27–28.) She had a personal care attendant, thirty-five hours per week, to do housework and remind her to take medications. (Tr. 28.) Plaintiff watched movies, played games, and went to church activities with her family. (*Id.*) She taught at her church, but only twenty minutes every six months. (*Id.*) She did not do things with friends. (Tr. 28–29.) She was a member of an online fibromyalgia support group, and she also used a computer to look things up for her husband and son. (Tr. 29.) She no longer did bookwork because it was too stressful for her. (*Id.*)

Plaintiff last worked by helping her husband farm. (Tr. 29–30.) This consisted of caring for pigs and cattle, and driving a tractor. (Tr. 30.) She quit this work when she got sick. (*Id.*) Plaintiff did some stretching twice a week, and on days she had bad pain, she took Percocet in addition to other medications. (Tr. 30–31.) Her medications caused dry mouth, and Percocet made her sleepy. (Tr. 31.) Plaintiff testified that she did not think she could work because she has to go to the bathroom frequently, is unable to sit in one spot for long without adjusting, and loses her focus and concentration. (Tr. 32.) She also had knee pain related to a weight problem, but she testified that her knee has felt pretty good for some time. (*Id.*) Plaintiff stated that she has a bad migraine headache once or twice a month. (Tr. 32–33.) However, her pain was over her whole body, and she felt like she had the flu all the time. (Tr. 33.) Plaintiff stated that she had good days and bad

days. (Tr. 35.) On a good day, she would be active for two or three hours, but only fifteen minutes at a time before a break. (*Id.*) On bad days, occurring two or three times a week, she did not get out of bed, and she wore pajamas most days. (Tr. 35–36.)

At the hearing, Plaintiff addressed a medical record that indicated that she was hurt while riding a four-wheeler. (*Id.*) She stated that she only rode the four-wheeler twice a year, to give her son a ride. (Tr. 36–37.) She also addressed a medical record that indicated that she walked at the Mall of America for eleven hours one day. (Tr. 37.) Plaintiff stated that it was for a school program for her son, so she pushed herself to go. (*Id.*) She sat quite a bit that day, and could not do anything for the next two or three days. (*Id.*) Finally, Plaintiff addressed a reference in the record to her hauling hay. (Tr. 37–38.) She stated that what that referred to was when she drove a truck into a field and sat there while her husband loaded the truck. (*Id.*) She had not done this very often, and she was no longer doing any farm activities. (Tr. 38.)

Plaintiff testified that she was not sure if she could stand for thirty minutes at a time, as her doctor indicated. (*Id.*) At times, she could not sit through a meal and had to stand. (*Id.*) And after sitting for thirty minutes, she would lay down. (Tr. 38–39.) She could walk 200 feet and lift five pounds. (Tr. 39.) Plaintiff stated that she was depressed due to her pain. (Tr. 40.) But she took Cymbalta for depression and fibromyalgia, and thought it helped. (*Id.*)

**Medical Expert Testimony**

A medical expert, Dr. Jared Frazin (not identified by name in the hearing tran-script but identified by resume in the record), testified at the hearing. (Tr. 41–43, 127.) He opined that Plaintiff did not meet or equal a listed impairment. (Tr. 41–42.) And he agreed with Dr. Colby's RFC opinion, finding it to be supported by the rest of the medical record. (Tr. 42.)

**Vocational Expert Testimony**

Kenneth Ogren testified at the hearing as a vocational expert.[11] (Tr. 43–44.) The ALJ asked Ogren the following hypothetical:

[A]ssume then that we have an individual who at alleged onset was 36, who is currently ... 42 years of age, who has high school[ ] plus education, work experience as outlined by yourself, who is on a number of medications, the only apparent side effects being some dry mouth and sleepiness, who is impaired with chondro patella bilaterally, fibromyalgia, suffers migraines, obesity, depression, anxiety, has a history of ADHD and history of urinary infection and IBS. Said individual is limited to lifting and carrying 10 pounds occasionally, five pounds frequently and can do all functional aspects of sedentary work. However, the individual would be limited to work where there would be easy access to bathroom facilities and then I mean on the same floor, which would allow a change of position every 30 minutes at the work station, who could do work which would require only occasional overhead work, bending, stooping, crouching, crawling, twisting or climbing, who must avoid moderate vibrations, temperature, humidity changes and hazardous equipment and who would be limited to work having only brief and superficial contact with others.

---

11. Based on the Vocational Case Consultant analysis, it appears that the vocational expert was Kenneth Ogren, whom the transcriber of the administrative hearing misidentified as "Mr. O'Burne." (Tr. 420.)

Could such a person do any work the [Plaintiff] has previously done? ·

(Tr. 43.) The vocational expert responded that such a person could not perform Plaintiff's past relevant work, but could perform other work such as information aide, inspector, and polisher. (Tr. 43–44.) He explained that there were 21,000 information aide jobs, 1,200 inspector jobs, and 3,000 polisher jobs all in the state of Minnesota. (Tr. 44.)

In a second hypothetical, the ALJ asked whether there would be any work in the regional or national economy for the same individual described in the first hypothetical if that person, "due to waxing and waning of symptoms, would be unable to attend to work with persistence and pace and be limited to part-time work and be absent from the work place more than two days a month." (Tr. 44.) The vocational expert responded that there would be no jobs that such a person could perform. (*Id.*)

## IV. The ALJ's Findings and Decision

On April 8, 2010, the ALJ issued a decision concluding that Plaintiff was not disabled as defined by the Social Security Act at any time from the alleged onset date of December 30, 2003, through December 31, 2006, the date last insured, and therefore denied Plaintiff's application for disability insurance benefits. (Tr. 10–22.) The ALJ followed the five-step procedure as set out in the Code of Federal Regulations. *See* 20 C.F.R. § 404.1520(a)(4). The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity;" (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities;" (3) whether the claimant's impairment "meets or equals a presumptively

disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel,* 149 F.3d 893, 894–95 (8th Cir.1998).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of December 30, 2003, through her date last insured of December 31, 2006. (Tr. 12.) At step two, the ALJ found that Plaintiff had the following severe impairments through the date last insured: "degenerative lumbar spondylosis, fibromyalgia, obesity, a history of urinary tract infections, irritable bowel symptoms, depressive disorder, anxiety disorder, a history of attention deficit disorder, and a history of methamphetamine abuse." (*Id.*) The ALJ found that Plaintiff's headaches were nonsevere because they occurred only once or twice a month. (*Id.*) And the ALJ found that Plaintiff's left knee pain was nonsevere because she testified that recently her knee felt pretty good. (Tr. 12–13.)

At step three of the disability determination procedure, the ALJ found that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13.) Based on Plaintiff's mental impairments, the ALJ concluded that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in main-

taining concentration, persistence, or pace. (Tr. 13–14.) In addition, the ALJ found that Plaintiff had no episodes of decompensation of extended duration, and that there was no evidence to establish the "C criteria" of the listed mental impairments. (Tr. 14.)

The ALJ found that Plaintiff had the RFC to perform all functional aspects of sedentary work as defined in 20 C.F.R. § 404.1567(a), except with the following limitations:

> [L]ifting 10 pounds occasionally and 5 pounds frequently; limited to work offering easy toilet access, with bathroom facilities on the same floor as the workspace; with an allowance for change of position every 30 minutes at the workstation; involving only occasional overhead work; limited to only occasional bending, stooping, crouching, crawling, twisting, and/or climbing; precluding even moderate exposure to vibrations, hazardous equipment and changes in temperature and/or humidity; and limited to work involving no more than brief and superficial contact with others.

(*Id.*) At step four, the ALJ concluded Plaintiff could not perform her past relevant work as a farmer. (Tr. 21.) And at step five, the ALJ found that based on the vocational expert's testimony there were other jobs that existed in significant numbers in the national economy that Plaintiff could have performed. (*Id.*) Thus, she ultimately concluded that Plaintiff was not "under a disability, as defined in the Social Security Act, at any time from December 30, 2003, the alleged onset date, through December 31, 2006, the date last insured[.]" (Tr. 22.)

## DISCUSSION

### I. Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A).

■ Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir.2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987) (quotation omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir.1998)). " 'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence support-

ing the [Commissioner's] findings." *Id.* In reviewing the administrative decision, " '[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' " *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

 In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *See Woolf v. Shalala,* 3 F.3d 1210, 1213 (8th Cir.1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir.1994); *see also Woolf,* 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala,* 30 F.3d 934, 939 (8th Cir.1994).

 The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel,* 221 F.3d 1065, 1069 n. 5 (8th Cir.2000); *Thomas v. Sullivan,* 928 F.2d 255, 260 (8th Cir.1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir.2000).

## II. The Commissioner's Motion to Remand and Plaintiff's Motion for Summary Judgment

This case presents the somewhat unusual circumstance where the Commissioner does not seek to affirm the ALJ's decision. Here, the Commissioner agrees that the ALJ improperly rejected the opinions of a treating medical source and a medical expert based on a flawed assumption that their opinions did not pertain to the relevant time period. The Commissioner seeks remand for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g), arguing that remand is appropriate because the record contains contradictory medical and nonmedical evidence that should be weighed by the ALJ, and because the record does not overwhelmingly support an outright award of benefits. The Commissioner contends that the ALJ should have the opportunity to consider evidence in the record that Plaintiff engaged in activities that contradicted her claims of disability. The Commissioner also points out that Dr. Colby, Plaintiff's treating physician, offered two RFC opinions, and the 2008 opinion contained greater limitations than the 2005 opinion. Further, the Commissioner contends that the ALJ should consider the state agency physicians' opinions that Plaintiff had a greater RFC than Dr. Colby assigned to her.

Plaintiff opposes remand and seeks reversal for an award of benefits. She contends that a remand would serve no purpose here because the treating physician, affirmed by the medical expert, opined that Plaintiff would be restricted to limited sedentary and only part-time work. And based on the treating physician's RFC opinion, the vocational expert testified that Plaintiff would be unable to perform her past relevant work or any other work. Plaintiff also contends that it is unnecessary to remand for the ALJ to consider

the state agency physicians' opinions because the ALJ did not cite the state agency physicians' opinions as a basis for rejecting the treating physician's opinion. Further, if remand is ordered, Plaintiff argues that the record is complete and should not be expanded to give the ALJ an opportunity to bolster evidence to deny the claim.

## A. Whether Remand is Necessary for the ALJ to Weigh the Medical Opinions

■ The typical remedy when the ALJ's disability determination is not supported by substantial evidence in the record as a whole is to remand for further administrative proceedings, especially in cases where the ALJ should have developed the record more fully. *See Cox v. Apfel,* 160 F.3d 1203, 1210 (8th Cir.1998). However, reversal and remand for an immediate award of benefits is the appropriate remedy where the record is fully developed and overwhelmingly supports a finding of disability. *Pate–Fires v. Astrue,* 564 F.3d 935, 947 (8th Cir.2009).

■ "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart,* 328 F.3d 418, 427 (8th Cir. 2003) (citing *Jenkins v. Apfel,* 196 F.3d 922, 925 (8th Cir.1999)). On the other hand, a treating physician's opinion is entitled to controlling weight when "the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir.2000). A consulting physician's opin-

ion may constitute substantial evidence on the record as a whole if the consulting physician's opinion was supported by better or more thorough medical evidence or if the treating physician rendered inconsistent opinions. *Wagner v. Astrue,* 499 F.3d 842, 849 (8th Cir.2007).

■ Here, the ALJ failed to recognize that Dr. Colby's opinion of Plaintiff's physical limitations from fibromyalgia was supported by medically acceptable clinical techniques. Plaintiff's diagnosis of fibromyalgia was made based on symptoms consistent with fibromyalgia and all eighteen tender points associated with fibromyalgia. *See supra* note 6; (Tr. 435–37, 439–41.) Consistent trigger point findings are objective evidence of fibromyalgia. *Brosnahan v. Barnhart,* 336 F.3d 671, 678 (8th Cir.2003). Therefore, the diagnosis of fibromyalgia simply does not require the type of objective findings the ALJ found absent in this case—neuromuscular weakness, reduced range of motion of the joints, or inflammatory muscle or joint disease. (See Tr. 16); *see also Sarchet v. Chater,* 78 F.3d 305, 308 (7th Cir.1996) ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced."). Because Plaintiff's subjective complaints of pain were consistent with her diagnosis of fibromyalgia, the ALJ should have given Dr. Colby's opinion controlling weight if it was consistent with the other substantial evidence in the record.

■ The Commissioner contends the case should be remanded for the ALJ to consider whether Dr. Colby's 2005 and 2008 [12] opinions are conflicting. Dr. Colby

---

12. The ALJ discounted Dr. Colby's 2008 RFC opinion because it "appears to relate to the [Plaintiff's] status in 2008, which was after her date of last insurance." (Tr. 20.) Simi-

wrote a letter to the Social Security Administration in 2005 stating that Plaintiff could not do her normal activities of daily living, or stand, sit, walk, carry, or lift for any length of time. (Tr. 467.) He also stated that if Plaintiff tried to be more active, she would need to rest in bed for the next day or two. (*Id.*) This opinion is consistent with Plaintiff's reports to Dr. Colby during her frequent visits for evaluation and treatment for fibromyalgia pain. (*See, e.g.,* Tr. 476–77, 489.) It is also consistent with Plaintiff's reports to Dr. Moutvic at Mayo Clinic, who evaluated Plaintiff and diagnosed her with fibromyalgia. (Tr. 435–37.) And Dr. Colby's more specific 2008 RFC opinion, limiting Plaintiff's sitting and standing to thirty minutes at a time, but for less than two hours a day each, was consistent with his earlier opinion that Plaintiff could not stand, sit, walk, carry or lift "for any length of time." (Tr. 467, 661.) The only discrepancy between Dr. Colby's 2005 and 2008 opinions is that in 2005 Dr. Colby said Plaintiff could not "carry or lift for any length of time nor anything over approximately 55# " and in 2008, Dr. Colby indicated that Plaintiff could occasionally lift less than ten pounds and never lift more than ten pounds. (Tr. 467, 662.) But Plaintiff testified she thought 55 pounds was a misprint in the 2005 letter, and it appears the medical expert agreed. (Tr. 40–41 (stating that the 55 pound notation "didn't really seem to fit in with the rest of [Dr. Colby's] assessment").) In light of all evidence in the record, this Court tends to agree as well,[13] which indicates that this supposed inconsistency is merely typographical.

As stated above, the ALJ could grant more weight to the nonexamining state agency consultants' less restrictive RFC opinions if their opinions were supported by better or more thorough evidence than Dr. Colby's opinion. Here, that is not the case. First, the physical, not the mental, RFC opinions were at issue. Second, Dr. Suddard's opinion, which the ALJ gave "considerable probative weight" but did not adopt (Tr. 19.), was based on what Dr. Suddard described as a "lack of objective findings to support multiple pain complaints." (Tr. 558.) Dr. Suddard pre-

---

larly, the ALJ discounted the medical expert's testimony as to Plaintiff's limitations because the testimony was based on Dr. Colby's 2008 opinion. (Tr. 21.) However, this Court agrees with both parties that the ALJ's discounting of Dr. Colby's 2008 opinion was erroneous because the RFC instructions stated, "Please complete this form for [Plaintiff's] condition prior to December, 2006," and there is nothing in the record to suggest Dr. Colby did not follow this instruction. (Tr. 658); *see Scheets v. Astrue,* No. 09–3437–CV–S–REL–SSA, 2011 WL 144919, at *17 (W.D.Mo. Jan. 18, 2011) ("Medical evidence from after a claimant's date last insured is only relevant to a disability determination where the evidence relates back to the claimant's limitations prior to the date last insured."); *Eastvold v. Astrue,* No. 03–3054, 2010 WL 1286334, at *47 (D.Minn.2010) (finding that the ALJ properly rejected a medical report because it "was completed several years after the date last insured" and "does

not purport to relate back to the date last insured".) Defendant argues that this case must be remanded to allow another ALJ to properly weigh Dr. Colby's 2008 RFC and the medical expert's testimony. This Court finds Defendant's argument unpersuasive because the record contains overwhelming proof that Plaintiff is disabled under 42 U.S.C. § 423(d)(1)(A). *See Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir.1992) ("Where the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate.").

**13.** Further, Dr. Colby's 2005 letter is less than clear as to what Dr. Colby meant by stating that Plaintiff could not "carry or lift for any length of time nor anything over approximately 55# ." He could have meant that she would not be able to carry or lift *any amount for any length of time.*

scribed aerobic exercise for Plaintiff's condition and stated that "there doesn't seem to be any barrier to seated work," but he qualified this statement by saying that this was "not to suggest that as an RFC." (Tr. 558.) Further, as discussed above, Plaintiff's diagnosis of fibromyalgia supports her multiple pain complaints, and the record actually does support a "barrier to seated work." For example, the record reflects that Plaintiff's pain is exacerbated by fatigue, prolonged sitting, repetitive movements, and stress, all of which can occur in seated work. (Tr. 439, 446, 455, 486, 490.) And third, although another nonexamining state agency consultant, Dr. Atkin, also offered a less restrictive physical RFC opinion than Dr. Colby, Dr. Atkin's opinion was limited to work restrictions caused by Plaintiff's migraines and chondromalacia patellae of the knees. (Tr. 630–37.) Because Dr. Atkin did not consider Plaintiff's fibromyalgia, his opinion does not conflict with Dr. Colby's opinion and cannot outweigh it. Based on the above, a remand is not necessary to weigh the medial opinions.

### B. Whether Remand is Necessary for the ALJ to Consider Plaintiff's Credibility

As stated above, the ALJ could have refused to grant controlling weight to Dr. Colby's RFC opinion if it was inconsistent with other substantial evidence in the record as a whole. The Commissioner contends that the Court should remand so that the ALJ can be given the opportunity to consider evidence of Plaintiff's daily activities that are inconsistent with disability. The ALJ, however, already had such an opportunity.

The ALJ made a finding that Plaintiff's treatment was generally successful. But this finding is inconsistent with Plaintiff's subjective complaints that her symptoms recurred often, and she frequently rated her pain as severe. (Tr. 35, 446, 471, 473, 480, 485, 488, 489, 491, 494.) The ALJ also noted that Plaintiff failed to pursue the Mayo Clinic Pain Rehabilitation Program and did not exercise as often as prescribed. (Tr. 16.) However, Plaintiff's explanations for these facts are found in the record and are supported by substantial evidence. Plaintiff and her husband lived on a farm. Although Plaintiff did very little farm work—which the ALJ recognized by making a finding that Plaintiff's farm work did not amount to substantial gainful activity during the relevant time period (Tr. 12.)—she did not attend the three-day program at Mayo Clinic because she and her husband had farm work to do at that time. (Tr. 491.) The record does reflect that Plaintiff attended a half-day Fibromyalgia Treatment Program. (Tr. 451–52.) And generally, when Plaintiff tried to do too much (usually when doing activities for the benefit of her children or her livelihood), she found herself in severe pain. (*See, e.g.,* Tr. 476.) For example, when Plaintiff spent one long day at the Mall of America, she suffered. And during a physical therapy appointment, after trying some exercises, Plaintiff "reported to be in too much pain to progress further today." (Tr. 453.) Plaintiff also reported that she only gave her son a ride on a four wheeler a couple times a year. Therefore, it seems reasonable that she would have avoided further exercise. Moreover, the fact that Plaintiff occasionally tried to push herself on days that she felt better so that she could be a part of her family's activities is not inconsistent with disability. *See Tilley v. Astrue,* 580 F.3d 675, 681 (8th Cir.2009) ("[Plaintiff's] ability to engage in some life activities, despite the pain it caused her, does not mean she retained the ability to work.").

Furthermore, this evidence regarding Plaintiff's daily activities is consistent with

Dr. Colby's RFC opinion, as Dr. Colby recognized that Plaintiff had good days and bad days. (Tr. 663.) And the record reflects that Plaintiff's fibromyalgia flared up when she tried to do too much, and it limited her daily activities such that it required her to have personal-care-attendant services and frequent treatment for fibromyalgia pain. After careful review, this Court concludes that Dr. Colby's opinion that Plaintiff's fibromyalgia would limit her to sedentary part-time work was consistent with the record as a whole, and should have been granted controlling weight, even in light of Plaintiff's daily activities.

Dr. Frazin, the medical expert at the hearing, agreed with Dr. Colby. And the vocational expert testified that a person of Plaintiff's age, education, work history, and impairments, who would be unable to attend work with persistence and pace, would be limited to part-time work, and would miss work more than two days per month, could not perform any jobs. (Tr. 44.)[14] Therefore, because the record is fully developed and Dr. Colby's opinion is consistent with the record as a whole, and based on the vocational expert's testimony, this Court concludes that reversal and remand for an immediate award of benefits is the appropriate remedy rather than a remand for further proceedings.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 8), be **GRANTED,** and the case be remanded pursuant to

sentence four of 42 U.S.C. § 405(g) for reversal and award of benefits;

2. Defendant's Motion to Remand (Doc. No. 14), be **DENIED;** and

3. Judgment be entered accordingly.

---

**14.** In her decision, the ALJ only considered the vocational expert's response to her *first* hypothetical, which did not include Dr. Colby's statements in his 2008 opinion regarding Plaintiff's limitations (lack of persistence and pace, limited to part-time work, missing more than two days of work per month). (*See* Tr. 22, 43.) Her *second* hypothetical included these limitations and is the relevant hypothetical to this case. (*See* Tr. 44.)